UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEMARCO PRYOR-MCCOVERY,

Petitioner,

v.

CASE NO. 2:24-CV-11727
HON. DENISE PAGE HOOD

JEFFREY HOWARD,

Respondent.
____________________________/

**OPINION & ORDER DENYING THE HABEAS PETITION, BUT GRANTING A CERTIFICATE OF APPEALABILITY**

## I. Introduction

Michigan prisoner DeMarco Pryor-McCovery ("Petitioner"), confined at the Kinross Correctional Facility in Kincheloe, Michigan, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that he is being held in custody in violation of his constitutional rights. ECF No. 1. Petitioner was convicted of first-degree child abuse, Mich. Comp. Laws § 750.136b(2), following a jury trial in the Otsego County Circuit Court and was sentenced to 20 to 50 years in prison in 2019. In his petition, he raises two claims concerning the effectiveness of trial counsel. *Id*. For the reasons stated, the Court denies the habeas petition, but grants a certificate of appealability.

## II. Facts and Procedural History

Petitioner's conviction arises from the asphyxia death of his girlfriend's infant daughter in 2018. The Michigan Court of Appeals described the underlying facts, which are presumed correct on habeas review, *see* 28 U.S.C. § 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> This case arises out of the death of one-year-old AN. At the time of AN's death, defendant was in a relationship with the child's mother. On June 28, 2018, defendant was watching AN and her two siblings while their mother was at work.[1] Defendant laid AN down at 11:15 a.m., and returned to check on her six minutes later. As defendant picked AN up, she vomited a yellow liquid, and her arm went stiff. Defendant changed AN's diaper, changed his shirt, and loaded all three children and the dog into the car to go to the hospital. The hospital was only 3½ miles away, and defendant believed that he could arrive there more quickly than summoning an ambulance. However, defendant ran out of gas and, because he had no cash, had to stop at four gas stations until he found one that would assist him. As a result, the trip to the hospital took 27 minutes.[2]
>
> Upon arrival at the hospital, an emergency technician removed AN from her car seat and observed that her fingers, toes, feet, and lips were blue. Medical personnel attempted to resuscitate AN, but were unsuccessful. The forensic pathologist, Dr. Brian Hunter, ultimately determined that AN's cause of death was asphyxia because of mechanical restriction of chest wall motion and obstruction of the airway coupled with the prone or facedown sleep position.[3] A mechanical restriction of the chest wall would not necessarily result in a bruise or mark on the outside of the body. Dr. Hunter further concluded that the manner of AN's death

was homicide.

Hospital workers train new parents on safe sleep practices before being discharged from the hospital.[4] Basically, new parents are advised that the infant should sleep in the crib alone on a tight fitted sheet. There should be no blankets, pillows, or other stuffed items in the crib. It is explained to the new parents that if these guidelines are not followed the infant could die. While defendant was not AN's biological father, testimony at trial established that he nevertheless was repeatedly trained on safe sleep practices, including instruction that an infant should not be swaddled in a blanket and should be placed on her back to sleep, by two different Child Protective Services (CPS) workers.[5] Moreover, the Pack N' Play where AN slept contained a warning label cautioning users about the danger of suffocation from blankets and pillows.

After AN's death, defendant voluntarily agreed to travel to the local Michigan State Police post for an interview with detectives. Defendant initially told detectives that AN vomited and then stopped breathing, so he performed chest compressions, but was unable to revive her. As the interview continued, the detectives expressed skepticism that AN's death occurred as defendant described. The detectives posited that her death was an accident, and defendant eventually admitted that he was aggravated with AN because she would not stop crying. He told detectives that he then tightly wrapped AN in an adult blanket to the point that she could not move her arms. Additionally, defendant demonstrated that the blanket covered AN's nose and that he placed her facedown on a pillow. Defendant further admitted AN died as a result of suffocation.

Defendant was arrested and charged with first-degree child abuse and first-degree felony-murder, MCL 750.316(1)(b), for causing AN's death. After defendant was arrested, he reenacted and verbally described how he wrapped AN in a large blanket like a "paper towel roll." His reenactment was videotaped, and

the video was played for the jury. During defendant's reenactment, a CPS worker remarked that what defendant did could have killed AN; defendant affirmed that observation.

The jury convicted defendant of first-degree child abuse, but acquitted him of first-degree felony-murder. After defendant filed his claim of appeal in this Court, he moved for a remand to the trial court for an evidentiary hearing to determine whether he was denied the effective assistance of counsel. Defendant asserted that defense counsel was deficient for failing to obtain the opinion of a pathology expert and that defense counsel was ineffective for failing to move to suppress defendant's statements made during the second portion of the police interview because the interview became custodial and defendant was not given his *Miranda*[6] rights. This Court granted the motion to remand.[7]

Thereafter, the trial court held an evidentiary hearing. In a 35-page written opinion and order, the court denied defendant's request for a new trial, finding that defendant was not deprived of the effective assistance of counsel at trial.

[1]AN was born on June 6, 2017. Her older siblings were four and two. Defendant was not the biological father of any of the children.

[2]The police estimated that the drive to the hospital should have taken between nine and ten minutes.

[3]Dr. Hunter also testified that the settling of the blood after death helped determine the position of AN's body at the time of death. Although the transcript identified this act of settling blood as "levity," it is apparent that Dr. Hunter defined "lividity." He testified that AN had lividity on both the front and back of her body, indicating that she was facedown when she died and turned over when aid was rendered.

[4]*See* MCL 333.5885.

[5]The reason for CPS involvement was not disclosed to the jury, but the record reflects that AN suffered two injuries in April 2018. The first injury was to AN's wrist from a rubber band while she was under defendant's care. The second injury involved defendant spanking ten-month-old AN's bare

buttocks, inflicting visible bruises.

[6]*Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[7]*People v McCovery*, unpublished order of the Court of Appeals, entered December 3, 2020 (Docket No. 348895).

*People v. Pryor-McCovery*, No. 348895, 2022 WL 2903973, *1-2 (Mich. Ct. App. July 21, 2022) (footnotes in original).

As indicated, Petitioner filed an appeal of right and a motion to remand with the Michigan Court of Appeals following his conviction and sentencing. He raised multiple claims for relief through counsel and in a pro per brief, including the two claims presented on habeas review.

On remand, the trial court conducted an evidentiary hearing on the ineffective assistance of trial counsel claims. At that hearing, Petitioner's pathology expert, Dr. Ljubisa J. Dragovic, Petitioner's trial counsel, Larry Brown, Petitioner's brother, Jakovan Pryor-McCovery, and Detective Sergeants Geyer and Voss testified and video recordings of Petitioner's interview and reenactment of the incident were placed into evidence. ECF No. 9-14. The Court adopts the summary of that testimony and those recordings as set forth by the trial court in its opinion and order denying Petitioner's motion for new trial. *See* ECF No. 9-15, PageID.1760-1764, 1765-1766. 1768-1775.

After the remand proceedings in the trial court, the Michigan Court of Appeals denied relief on Petitioner's claims and affirmed his conviction and sentence. *Pryor-McCovery*, 2022 WL 2903973 at *2-15. Petitioner also filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Pryor-McCovery*, 511 Mich. 1018, 991 N.W.2d 563 (2023).

Petitioner thereafter filed his federal habeas petition. He raises the following claims:

> I. Ineffective assistance of trial counsel for failing to consult expert in pathology who would have testified about the difficulty, if not impossibility, of ruling out accident as the manner of death.
>
> II. Ineffective assistance of trial counsel for failure to move to suppress his statements during an un-Mirandized interview that turned into a custodial interrogation.

ECF No. 1. Respondent has filed an answer to the petition contending that it should be denied. ECF No. 8.

## III. Standard of Review

Federal law imposes the following standard of review for habeas cases brought by state prisoners:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be

> granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S.

510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-521 (citations omitted); *see also Williams*, 529 U.S. at 409. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have

supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*. Thus, in order to obtain federal habeas relief, a state prisoner must show that the state court's rejection of a claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*.; *see also White v. Woodall*, 572 U.S. 415, 419-420 (2014). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision reasonable. *Woods v. Etherton*, 576 U.S. 113, 118 (2016); *Woods v. Donald*, 575 U.S. 312, 316 (2015).

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this

Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-126 (2008) (per curiam)); *Lockyer*, 538 U.S. at 71-72. Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of clearly established law are determined solely by Supreme Court precedent. Thus, "circuit precedent does not constitute 'clearly established Federal law as determined by the Supreme Court'" and it cannot provide the basis for federal habeas relief. *Parker v. Matthews*, 567 U.S. 37, 48-49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam). The decisions of lower federal courts, however, may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state's factual determinations are presumed correct on federal

habeas review. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-361 (6th Cir. 1998). Habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV. Analysis

### A. Effectiveness of Trial Counsel – Expert Witness

Petitioner first asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to consult and call an expert witness in pathology to testify for the defense as to the victim's cause of death. Respondent contends that this claim lacks merit.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Id*. at 687. Second, the petitioner

must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id*.

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance." *Id*. at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id*. at 689. There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding. *Id*. "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

Petitioner raised this claim on direct appeal. The Michigan Court of Appeals denied relief, explaining:

> "[A] defense attorney may be deemed ineffective, in part, for failing to consult an expert when counsel had neither the education nor the experience necessary to evaluate the evidence and make for himself a reasonable, informed determination as to whether an expert should be consulted or called to the stand[.]" *People v Trakhtenberg*, 493 Mich 38, 54 n 9; 826 NW2d 136 (2012) (quotation marks and citation omitted). Consultation with a potential expert, in some cases, is part of counsel's "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Ackley*, 497 Mich 381, 390; 870 NW2d 858 (2015) (quotation marks and citation omitted).

Again, "decisions regarding what evidence to present and which witnesses to call are presumed to be matters of trial strategy, and we will not second-guess strategic decisions with the benefit of hindsight." *Dunigan*, 299 Mich App at 589-590. "An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). The failure to call witnesses is analyzed under the same standard as all other claims of ineffective assistance of counsel. *People v Jurewicz*, 506 Mich 914; 948 NW2d 448 (2020).[13] Accordingly, defendant was required to demonstrate that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *Id*., citing *Trakhtenberg*, 493 Mich at 51.

In this case, Dr. Hunter, who conducted AN's autopsy, testified that her cause of death was asphyxia because of mechanical restriction of her chest wall motion and obstruction of her airway. Dr. Hunter opined that AN's manner of death was homicide, meaning that death occurred at the hands of another.[14] Defendant did not dispute Dr. Hunter's conclusion in regard to AN's cause of death. Rather, defendant's position at trial was that her death did not have the requisite intent.

Defense counsel testified at the evidentiary hearing. He had been an attorney for eleven years. Seventy-five percent of his practice was comprised of criminal cases, but this was his first murder trial. He had defended first-degree child abuse cases, but this was the first he had taken to trial. He considered consulting an expert pathologist early in the case and read scholarly articles pertaining to forensic pathology. Eventually, he concluded that Dr. Hunter's autopsy findings supported the defense's theory of the case. Defense counsel remembered that Dr. Hunter changed the manner of death after speaking with police officers, which meant that without that information, Dr. Hunter would have classified the manner of death as undetermined.[15] Moreover, Dr.

Hunter acknowledged that the homicide classification did not address the actor's intent. Defense counsel believed that his main focus should be on the intent required to establish homicide and that, on cross-examination, Dr. Hunter would agree that a homicide could not be established under these facts and circumstances.

After trial, defendant obtained the services of forensic pathologist Dr. Ljubisa Dragovic. Dr. Dragovic agreed that AN's cause of death was asphyxia. However, he opined that accident could not be ruled out as the manner of death. Dr. Dragovic acknowledged that swaddling AN was an intentional act, but he explained that the action was done to pacify the child. Dr. Dragovic opined that people can be instructed about safe-sleep practices multiple times, but accidents continue to happen. He believed that AN's death was the result of “stupidity.” But Dr. Dragovic did not review the reenactment video, wherein defendant affirmed that his actions of wrapping AN in a blanket so tightly that she could not move her arms, covering her nose and mouth, and placing her facedown could kill her. Nor did Dr. Dragovic read the testimony concerning the number of times that defendant was instructed on safe sleep—six.[16] Dr. Dragovic candidly conceded that [he] may have altered his opinion if provided with additional information.

The trial court found that Dr. Dragovic's testimony was premised on a “less-than-full examination of the documentary and testimonial records” because the pathologist did not examine defendant's reenactment video or have knowledge of defendant's extensive safe-sleep training. The trial court also noted defense counsel's focus on negating the specific intent to kill and eliciting Detective Geyer's belief that defendant did not intend to kill AN.[17] Following these key factual findings,[18] the trial court concluded that the claim of ineffective assistance of counsel failed. It determined that: (1) Dr. Dragovic's opinion was premised on incomplete information despite his recognition that “a forensic pathologist must look at all of the circumstances to determine a manner of death since not every intentional act

resulting in a death qualifies as a homicide"; (2) even in the absence of Dr. Dragovic's opinion, defense counsel successfully defended the primary charge of felony-murder; and (3) it was not reasonably likely that a defense expert would have made a difference in the outcome of the case.[19] *Hoag*, 460 Mich at 6. Based on the record, we cannot conclude that the trial court's factual findings were clearly erroneous. *Miller*, 326 Mich App at 726.[20]

[13]Although the *Jurewicz* decision was rendered in an order, Supreme Court orders with an understandable rationale constitute binding precedent. *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

[14]Manner of death is divided into five general categories: natural, homicide, suicide, accident, and indeterminate. Homicide is where death results from the purposeful act of another while accident is where the fatal outcome is unintentional.

[15]Defendant contends that there was no evidence of an earlier death certificate or two reports. But the deputy medical examiner, who also separately served as a police officer, was present during defendant's reenactment and responsible for investigating AN's death and gathering information for the medical examiner. Regardless, Dr. Hunter agreed that without additional information from the police, his classification would have been undetermined.

[16]At trial, one of the CPS workers estimated the number of times he reviewed safe-sleep protocols with defendant. At the evidentiary hearing, the other worker testified about the documented instruction.

[17]Although defense counsel initially asked the trial court to instruct the jury on accident as a defense, he withdrew that request, opting to focus the jury on defendant's lack of the requisite intent. Defense counsel's decision regarding a defense is a matter of trial strategy. *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995). The law affords defense counsel "wide discretion in matters of trial strategy because many calculated risks may be necessary in order to win difficult cases." *People v Unger*, 278 Mich App 210, 242; 749 NW2d 272 (2008) (citation omitted).

[18]The trial court did not find that trial counsel lacked the necessary experience and failed to perform the necessary research as claimed by appellate counsel, factual findings necessary to support the raised claim of

ineffective assistance of counsel.

[19]Although the trial court also cited to caselaw addressing the failure to present a substantial defense in the context of ineffective assistance, the trial court nonetheless determined that the evidence proffered by defendant at the evidentiary hearing would not have caused a different outcome in the case. Going forward, the trial court should follow *Jurewicz*, 506 Mich at 914 ("[t]he defendant was not required to show, in order to obtain relief for ineffective assistance of counsel, that trial counsel's failure to call witnesses deprived him of a substantial defense.").

[20]Regardless of defense counsel's failure to present Dr. Dragovic's testimony, he elicited testimony from Detective Geyer that defendant did not intend to kill AN, an assertion that the prosecution did not dispute. Further, the medical examiner, the police, and the CPS workers acknowledged that, despite education efforts, parents did not follow safe-sleep practices and infant deaths ensued. Thus, even in the absence of defense expert testimony, counsel posited through other witnesses that defendant's actions did not fulfill the elements of the charged offenses, including intent, and succeeded in convincing the jury that defendant was not guilty of felony-murder.

*Pryor-McCovery*, 2022 WL 2903973 at *8-9 (footnotes in original).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. It is well-settled that defense counsel must conduct a reasonable investigation into the facts of a defendant's case, or make a reasonable determination that such investigation is unnecessary. *Wiggins*, 539 U.S. at 522-523; *Strickland*, 466 U.S. at 691; *Stewart v Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2007). The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning ... guilt or innocence,"

including impeachment evidence. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).

That being said, decisions as to what evidence to present and whether to call certain witnesses are presumed to be matters of trial strategy. The cross-examination of witnesses, like deciding what evidence to present, is also a matter of trial strategy. *Dell v. Straub*, 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002). When making strategic decisions, counsel's conduct must be reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000); *see also Wiggins*, 539 U.S. at 522-523. The failure to call witnesses or present other evidence constitutes ineffective assistance of counsel only when it deprives a defendant of a substantial defense. *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).

In this case, Petitioner's fails to establish that trial counsel erred by not consulting or calling a pathology expert at trial. The record reveals that counsel considered consulting a pathology expert, but reviewed the autopsy report (and other evidence), read forensic materials, and made a strategic decision to focus on negating the intent required to support the murder charge. Given the circumstances of the victim's death, this was a reasonable trial strategy and the Court will not second-guess that strategy.

To be sure, defense counsel may even concede a defendant's guilt of lesser offenses in an effort to avoid conviction on more serious charges without running afoul of the Sixth Amendment. *See, e.g., Poindexter v. Mitchell*, 454 F.3d 564, 582 (6th Cir. 2006) (citing *Florida v. Nixon*, 543 U.S. 175, 189 (2004), and ruling that counsel was not ineffective for conceding that petitioner was guilty of murder, but arguing he was not guilty of aggravated murder); *Smith v. Jones*, No. 2:03-CV-10230, 2007 WL 470548, *6-7 (E.D. Mich. Feb. 7, 2007) (counsel was not ineffective for conceding guilt on home invasion and robbery charges and contesting sexual assault charges).

Moreover, counsel's strategy was successful in that Petitioner was not convicted of first-degree murder. The fact that counsel's strategy did not absolve Petitioner of the first-degree child abuse charge does not mean that counsel was ineffective. *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) ("an ineffective assistance of counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").

But even if Petitioner is correct that trial counsel should have consulted or called a pathology expert, i.e. Dr. Dragovic, he nonetheless fails to establish that that he was prejudiced by counsel's conduct. While Dr.

Dragovic opined that accident could not be ruled out as the victim's cause of death, he admitted that he had not watched the reenactment video (showing that Petitioner tightly wrapped the victim in a blanket, where she could not move her arms and her nose and mouth were covered, and laid her face down on a pillow) and was not aware that Petitioner had been instructed six times on safe sleep practices. Dr. Dragovic also conceded that the additional information may have altered his opinion. Given such admissions, along with the other presented at trial, it cannot be said that there is a reasonable probability that Dr. Dragovic's testimony would have affected the outcome at trial.

Petitioner was also not deprived of a substantial defense as counsel presented police testimony (and Petitioner's own statements) indicating that he did not intend to kill the victim, as well as testimony from medical personnel, police, and social workers that parents sometimes did not follow safe sleep practices resulting in infant deaths. Again, it must be noted that while the jury convicted Petitioner of first-degree child abuse, it acquitted him on the more serious charge of first-degree murder, which carries a mandatory, non-parolable life sentence. Petitioner fails to establish that trial counsel was ineffective under the *Strickland* standard. More importantly,

for the purpose of habeas review, the Michigan Court of Appeals' decision to that effect is reasonable. Habeas relief is not warranted on this claim.

**B. Effectiveness of Trial Counsel – Suppression**

Petitioner also asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to move to suppress his police statements based upon a perceived violation of his *Miranda* rights. Respondent contends that this claim lacks merit.

As discussed *supra*, to prevail on an ineffective assistance of trial counsel claim, a habeas petitioner must prove that counsel's performance was deficient and that he was prejudiced by counsel's conduct. *Strickland*, 466 U.S. at 687.

Petitioner raised this claim on direct appeal. The Michigan Court of Appeals denied relief, explaining:

> "Every person has a constitutional right against self-incrimination." *Id*., citing U.S. Const., Am. V; Const. 1963, art. 1, § 17. "To effectuate this right, the police must warn a defendant of his or her constitutional rights if the defendant is taken into custody for interrogation." *Barritt* (After Remand), 325 Mich App at 561. "'[C]ustody' is a term of art. that specifies circumstances that are thought generally to present a serious danger of coercion." *Id*. at 562 (citations omitted). To determine whether a person is in custody, the first step is to ascertain whether, in light of "the objective circumstances of the interrogation a reasonable person [would] have felt he ... was not at liberty to terminate the

interrogation and leave." *Id*. The relevant circumstances that a court must consider are: "(1) the location of the questioning; (2) the duration of the questioning; (3) statements made during the interview; (4) the presence or absence of physical restraints during the questioning; and (5) the release of the interviewee at the end of the questioning." *Id*. at 562-563. "[N]o one circumstance is controlling; rather, a reviewing [c]ourt must consider the totality of the circumstances when deciding whether an individual was subjected to custodial interrogation under *Miranda*." *Id*. at 563.

"The ultimate question whether a person was 'in custody' for purposes of *Miranda* warnings is a mixed question of fact and law, which must be answered independently by the reviewing court after review de novo of the record." *People v Barritt* (After Remand), 325 Mich App 556, 561; 926 NW2d 811 (2018) (quotation marks and citation omitted). "This Court reviews for clear error the trial court's factual findings concerning the circumstances surrounding statements to the police." *Id*. "A finding is clearly erroneous if, after reviewing the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

Addressing the first *Barritt* factor, the location of the questioning, the court acknowledged that the interview took place at a state police post. However, it further noted defendant was advised that he was not in custody, the interview was voluntary, he could leave at any time, and the door was unlocked. Indeed, defendant voluntarily exited the room after writing his statement. The trial court concluded that a brief break of approximately six minutes between the first and second sessions did not alter the nature of defendant's interview despite not being re-apprised of the conditions. We find no error in this determination.

With regard to the length of questioning, the trial court found that this factor also weighed against a finding of custody. While the

entire interview lasted approximately 2½ hours, defendant took 30 minutes of that time to write his initial statement. The second portion of the interview lasted 1½ hours and was the only time period challenged as custodial. The trial court concluded that the timeframe of the interview was not suggestive of a custodial interrogation. We also find no error in this determination.

The trial court found the third factor, addressing the statements made during the interview, also weighed against a finding that defendant was in custody. The trial court noted that the circumstances surrounding defendant's interview did not suggest that defendant's statement was impacted. Specifically, the trial court noted that defendant was not threatened with arrest, was not prevented from leaving, and his freedom of movement was not interfered with in a significant manner. Thus, there was no indication that the statement was the result of intimidation. We agree.

The fourth consideration involves whether defendant was physically restrained during the interview, and the trial court found this factor weighed against a custodial interview. Defendant was not restrained in any manner. He sat at a table with the interviewing detectives without handcuffs. The door to the interview room was closed, but unlocked. Indeed, defendant got up and left after he finished his written statement. The trial court thus did not err in finding that this factor weighed against a finding of custody.

The final factor concerns whether defendant was released after the interview. It is undisputed that defendant was arrested after the interview. The trial court found that this factor weighed in favor of a finding of custody. The trial court also considered whether a reasonable person in defendant's situation would believe that he was free to leave and whether the police station presented an inherently coercive environment. The trial court rejected those considerations as creating an inherently custodial environment. At the conclusion of its examination of the totality

> of the circumstances, the trial court found that defendant was not in custody during any portion of the police interview. Accordingly, the court concluded it was not objectively unreasonable for trial counsel to fail to file a motion seeking suppression of the statement. The trial court further found that trial counsel's failure to file a motion to suppress was successful and sound trial strategy. Specifically, during defendant's interview, Detectives Geyer and Voss both expressed their belief that defendant did not intend to kill AN. Thus, defense counsel feared that the detectives would not testify regarding the lack of intent if defendant's statement was suppressed. Thus, the trial court rejected the claim of ineffective assistance of counsel.
>
> In light of the trial court's factual findings, we cannot conclude that the trial court clearly erred in its determination that defendant was not in custody for purposes of his interview. The record supports the trial court's determinations and the trial court properly found defendant was not entitled to have his statements from the second portion of the interview suppressed. *Barritt* (After Remand), 325 Mich App at 561, 583-584.[21] As a result, defendant failed to show that defense counsel was ineffective by not pursuing suppression of defendant's statements.
>
> [21]We also reject defendant's contention that the reenactment video should also have been suppressed and his reliance on *Missouri v Seibert*, 542 US 600, 124 S Ct 2601; 159 L Ed 2d 643 (2004), for the reasons articulated by the trial court. The trial court did not render factual findings pertaining to custody to render the *Seibert* decision analogous.

*Pryor-McCovery*, 2022 WL 2903973 at *10-11 (footnote in original).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. Petitioner fails to establish that trial counsel was ineffective for not seeking suppression of his police statements. First, as discussed by the state

courts, the record indicates that counsel did not move to exclude the statements because they contained Petitioner's assertions and the police detectives' acknowledgements that he did not intend to kill the victim, thereby providing evidence to negate the intent required to support a conviction for first-degree murder. Such a decision was reasonable given counsel's overall strategy of seeking an acquittal on the more serious murder charge which carries a mandatory life sentence. Again, counsel's strategy was successful in that Petitioner was not convicted of first-degree murder, and the fact that it did not absolve Petitioner of the first-degree child abuse charge does not mean that counsel was ineffective. *See Moss*, 286 F.3d at 859.

Second, counsel's decision not to seek suppression of Petitioner's police statements was reasonable given that such a motion was unlikely to be successful. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that statements made during a custodial interrogation of a suspect are inadmissible at trial, unless the defendant has voluntarily and knowingly waived certain rights prior to making the statements. The Supreme Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. A person is "in

custody" for purposes of *Miranda* when his or her "freedom of action [is] curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). A restraint on a person's freedom of movement alone is not sufficient to find that a person is "in custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). The Supreme Court has also distinguished "custodial interrogation" from the mere questioning of a suspect in a "coercive environment":

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.

*Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

The custody determination thus "involv[es] two essential questions: '[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.'" *Thompson v Keohane*, 516 U.S. 99, 112 (1995). A reviewing court must

consider "all of the circumstances surrounding the interrogation." *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam). Relevant factors include "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and release of the interviewee at the end of questioning." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (internal citations omitted); *See also* United States v. Luck, 852 F.3d 615, 621 (6th Cir. 2017); *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). The relevant inquiry is "how a reasonable person in the suspect's position would have understood the situation. *Berkemer*, 468 U.S. at 442. This objective standard outweighs the suspect's subjective beliefs. A determination as to whether a person is in custody also does not depend on the subjective, unexpressed intent of the interrogating police officers. *Stansbury*, 511 U.S. at 322-324.

In this case, the record supports the state trial court and the Michigan Court of Appeals' determinations that Petitioner was not in custody when he gave his police statements before being arrested such that *Miranda* warnings were not required. First, while Petitioner's interview occurred at a Michigan State Police post, Petitioner voluntarily appeared for questioning and the interview was conducted in an unlocked room. Second, Petitioner was

advised that he was not in custody, that the interview was voluntary, and that he could leave at any time. Third, Petitioner was not restrained and he actually left the building for a few minutes after he completed his written statement and before being asked to come back into the room for further questioning. Fourth, the total interview (including the time when Petitioner wrote his statement) only lasted about two and a half hours and there is no indication that the questioning was hostile or coercive. Lastly, Petitioner was free to leave at any time before he was arrested (although he was arrested after the conclusion of the interview). Considering such circumstances, Petitioner fails to establish a violation of his *Miranda* rights or, more relevantly, that the state courts' underlying rulings on this issue were unreasonable.

Given that the state courts' reasonably ruled that Petitioner was not in custody when he made his police statements such that there was no *Miranda* violation, Petitioner cannot establish that trial counsel erred and/or that he was prejudiced by counsel's conduct in not moving to suppress his police statements. Counsel cannot be deemed ineffective for failing to make a futile or meritless motion. *Tackett v. Trierweiler*, 956 F.3d 358, 375 (6th Cir. 2020); *Hoffner v. Bradshaw*, 622 F.3d 487, 499 (6th Cir. 2010); *see also*

*Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2014) ("Omitting meritless arguments is neither professionally unreasonable nor prejudicial."). Petitioner fails to establish that trial counsel was ineffective under the *Strickland* standard. Habeas relief is not warranted on this claim.

## V. Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief. Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal this decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists could find the court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-485 (2000). ""A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Having

considered the matter, the Court concludes that Petitioner meets this standard as to both of his habeas claims. Accordingly, the Court **GRANTS** a certificate of appealability should Petitioner seek to appeal this decision.

The case before this Court is hereby closed.

**IT IS SO ORDERED**.

s/Denise Page Hood
DENISE PAGE HOOD
United States District Judge

Dated: September 30, 2026